# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2681

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GABRIEL MENDOZA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 03 CR 109—**James T. Moody**, *Judge.*

ARGUED DECEMBER 1, 2005—DECIDED FEBRUARY 23, 2006

Before FLAUM, *Chief Judge*, and BAUER and EVANS, *Circuit Judges.*

BAUER, *Circuit Judge.* Gabriel Mendoza was charged and convicted of five criminal offenses. Namely, a jury found him guilty of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); an alien illegally possessing a firearm, in violation of 18 U.S.C. § 922(g)(5); possession with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841; possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841; and illegal reentry into the United States as a deported alien, in violation of 8 U.S.C. § 1326. The district court sentenced Mendoza to 292 months in prison.

Mendoza argues that evidence pertaining to counts three and four was obtained from a warrantless search of his vehicle, which was parked in the unattached garage of the residence where he was staying. The district court found this evidence admissible because Mendoza failed to demonstrate that he had a reasonable expectation of privacy in the garage. We affirm the ruling of the district court.

## I. Background

The Metro Special Operation Section ("MSOS") of the South Bend Police Department received information suggesting that defendant Gabriel Mendoza and his brother Juan were dealing in narcotics. On September 9, 2003, Sergeant Jamie Buford, a member of the MSOS, conducted surveillance at Mendoza's home. Buford noticed a Corvette parked illegally outside the house. Because he was in plainclothes, Buford requested a uniformed officer's assistance to knock on the door of the house.

At 3:30 p.m, Gabriel Mendoza answered the door and spoke with the uniformed police officer. They both walked to the Corvette, where Buford approached them. Buford displayed his badge and identified himself to Mendoza. He then read Mendoza his *Miranda* rights and explained that he was conducting a narcotics investigation at the residence. Mendoza said there were no narcotics at the house. Buford asked Mendoza if there were any weapons in the house, and Mendoza said, "Yes". Seeking permission to search the residence, Buford asked if he could look around and he read a "Permit to Search" form to Mendoza verbatim. Buford explained that Mendoza was not required to permit the search. Mendoza verbally agreed to permit a search, and even laughed at the idea of any drugs being there, joking that if there were any drugs in the house he would help the officer carry them out.

Mendoza and Buford entered the house while the uniformed officer stayed outside. They first went to the bedroom, where Mendoza directed Buford to the firearm. After Buford secured the weapon, Mendoza admitted to owning the weapon. He also said that he had been convicted of a felony in Nebraska for trafficking in marijuana. After he had been convicted in Nebraska, Mendoza was deported. He was in the United States illegally.

Continuing the search, Buford found a notebook that appeared to be a drug ledger. When asked about it, Mendoza said it was old. They then went to the kitchen, where Buford found a food vacuum sealer and plastic baggies. Buford discovered a brown residue on the sealer that smelled like methamphetamine. He then went into the hallway, where he found a small digital scale on a shelf that also had a white powder residue. Buford examined the scale because he believed it was the kind used by drug traffickers to weigh narcotics. While Buford was examining the scale, Mendoza slapped the scale out of his hands and said that it was used to mail letters to his mother. Buford conducted field tests on the residue he found, which confirmed his belief that the residue was methamphetamine and cocaine. He then arrested Mendoza and placed him in the backseat of the patrol car.

Buford suspected that Mendoza was a "mule", a person who transports narcotics for others, and asked Mendoza if he would be willing to talk about it further. Mendoza said that he had been making trips from South Bend to Washington state, but claimed that he had stopped moving drugs two months prior because he had made enough money to retire. With his drug profits, Mendoza said he bought a Chevy Tahoe and spent about $4,000 on the Corvette that was parked on the street in front of the house. The Corvette had Delaware plates. Because the garage door was open, Buford could see the Chevy Tahoe in the garage. He could also see the Chevy Tahoe through a garage window.

At about 4:00 p.m., shortly after Mendoza had been taken to the police station, Sergeant Buford's supervisor, Douglas Radican, arrived at the residence. Radican was a sergeant with the South Bend Police Department but also had been cross-designated as a Task Force Agent with the Drug Enforcement Administration (DEA). Buford had called Radican and told him that Mendoza had admitted purchasing the Tahoe and Corvette with drug proceeds. He also told him that Mendoza consented to a search of the residence. After verifying that the Chevy Tahoe was registered to Mendoza, and that there were no liens against it, Radican decided to seize the vehicle. The Corvette, on the other hand, had substantial liens on it and Radican therefore decided not to initiate a forfeiture against it.

Pursuant to administrative forfeiture, Radican seized the Chevy Tahoe from the unattached, one-stall garage at the residence. Once the Chevy Tahoe was in the police garage, the officers had it inspected by a drug dog. The dog was alerted to the rear deck of the vehicle, but since the officers saw drug residue on the carpet they believed that the residue was what caught the dog's attention. The next day Radican began processing the forfeiture paperwork.

Over the next few days, the DEA received an inordinate amount of phone calls inquiring about the Chevy Tahoe. Further, the jail where Mendoza was held received other phone calls asking about the release of the Chevy Tahoe. Radican concluded that the number of phone calls and interest in the vehicle was highly suspicious. As a result, he arranged to have the vehicle examined for a hidden compartment.

On September 24, 2003, the police had a cooperating source, who was knowledgeable in the installation of trap doors, examine the vehicle. This examination revealed that the seals of the back floor had recently been resealed and repainted. Under the seal there was a hidden compartment,

or trap, approximately five to six inches deep that ran the length of the Chevy Tahoe's back deck. In this hidden compartment, the police found 26 pounds of methamphetamine and 16 kilograms of cocaine.

A Grand Jury for the Northern District of Indiana returned a five-count indictment against Gabriel Mendoza on October 9, 2003, alleging violations of 18 U.S.C. § 922(g)(1), 18 U.S.C. § 922(g)(5), 21 U.S.C. § 841, and 8 U.S.C. § 1326.

On April 12, 2004, district court Judge Allen Sharp conducted a hearing on Mendoza's Motion to Quash Arrest and Suppress Evidence. Sergeants Buford and Radican both testified. Mendoza declined to present any evidence at the suppression hearing. On April 20, 2004, Judge Sharp issued his order denying the Motion to Quash Arrest and Suppress Evidence. After several continuances of the trial and a transfer to Judge James Moody, the two-day trial began on November 29, 2004, resulting in a guilty verdict on all five counts. Mendoza was sentenced to 292 months on May 26, 2005, and a timely appeal was filed on June 2, 2005.

## II. Discussion

Mendoza seeks to suppress the 26 pounds of methamphetamine and 16 kilograms of cocaine found in the Chevy Tahoe seized after the search of his vehicle. On appeal from a denial of a motion to suppress, we review the district court's factual findings for clear error and questions of law *de novo*. *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005).

A defendant who objects to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). A defendant cannot assert a privacy interest on behalf of someone else. Indeed, a defendant

charged with a crime of possession can only claim the benefits of the exclusionary rule if his or her own Fourth Amendment rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 85 (1980). Additionally, a defendant must show a privacy interest not only in the seized good, but also in the area where the good was found. *Id.* The Supreme Court has declined "to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched." *Id.* at 92.

A reasonable expectation of privacy is infringed when (1) the defendant exhibits an actual or subjective expectation of privacy and (2) the expectation is one that society is prepared to recognize as reasonable. *Katz v. United States*, 389 U.S. 347, 361 (1967). Further, a defendant objecting to a search bears the burden of proving that he or she had a legitimate expectation of privacy in the actual area searched. *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003) (citing *United States v. Ruth*, 65 F.3d 599, 604 (7th Cir. 1995)). In order to present a prima facie case of a violation of the Fourth Amendment, there must be some "reasonable expectation" of privacy in the area searched. *Kyllo v. United States*, 533 U.S. 27, 33 (2001). But, this reasonable expectation of privacy must be demonstrated to the Court. As we explained in *Ruth*, "without an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest . . . ." *Ruth*, 65 F.3d at 605.

In this case, Mendoza has only offered conclusory statements regarding his privacy interest in the unattached garage. In fact, the only evidence in the record even referencing Mendoza's residency is a Housing Identification card from Pasco, Washington and the Delaware license plates on the Corvette. Mendoza did not show that he had the right to exclude others or regulate access to the garage where his Chevy Tahoe was parked. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (holding that defendant must have a

legitimate expectation of privacy in the premises before he can claim protection under the Fourth Amendment). Even if we were to suppose that the search was illegal, the Court has held that "legal possession of a seized good is not a proxy for determining whether the owner had a Fourth Amendment interest, for it does not invariably represent the protected Fourth Amendment interest." *Salvucci*, 448 U.S. at 91.

At the suppression hearing and throughout the briefing to this Court, Mendoza has failed to demonstrate his privacy interest in the unattached garage. Without some factual finding establishing that Mendoza had an actual or subjective expectation of privacy, we agree with the district court that there is no Fourth Amendment violation.

Mendoza volunteered to Buford that he had retired from drug trafficking. He explained that he had made enough money to retire and in fact sunk some of his profits into the Corvette parked on the street and the Chevy Tahoe parked in the garage. By offering this information, Mendoza himself gave the police probable cause to believe that the vehicles were subject to civil forfeiture. As we have stated elsewhere, "[t]he weight of authority . . . holds that police may seize a car without a warrant pursuant to a forfeiture statute if they have probable cause to believe that the car is subject to forfeiture." *United States v. Pace*, 898 F.2d 1218, 1241 (7th Cir. 1990) (citations omitted). Further, all proceeds traceable to controlled substance distribution are subject to forfeiture. *See* 18 U.S.C. § 981 (2000); 21 U.S.C. § 881 (2000).

Mendoza contends that the consent he gave to search the house did not extend to the unattached garage that stored his Chevy Tahoe. Under the Fourth and Fourteenth Amendments, it is well-settled law that warrantless searches are per se unreasonable, "subject only to a few

specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One readily recognized exception is a search pursuant to consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1967), which "was not the product of duress or coercion, express or implied." *Id*. at 227. The government must prove that consent was voluntary by a preponderance of the evidence. *United States v. Bernitt*, 392 F.3d 873, 877.

In this case, it seems clear to this court that Mendoza voluntarily gave his consent for Sergeant Buford to search the house. In fact, Mendoza even made light of the situation. Specifically, in response to Buford's request to search the house for narcotics, Mendoza laughed and said that he would have helped Buford carry out any drugs that he found in there. Even after Buford advised Mendoza that he could refuse the request to search, Mendoza flippantly answered, as if the thought of drugs found in the house was laughable.

While Mendoza concedes that he consented to the search of the house, he argues that his consent did not extend to the unattached garage. This case, however, does not hinge on such a fine determination. Instead, the question is one of a reasonable expectation of privacy. The close call as to whether Sergeant Buford's recitation of the Permit to Search form translates into consent for Sergeant Radican (who did not arrive at the scene until after Mendoza was taken to the police station) to search the unattached garage does not determine the outcome of this case. Rather, as we have shown, without a demonstrated legitimate expectation of privacy in the area searched, Mendoza's Fourth Amendment rights have not been violated. We agree with the district court that *United States v. Ruth* is controlling here. *Ruth*, 65 F.3d 599. As a result, the denial of the motion to suppress, and the conviction and sentence are AFFIRMED.

A true Copy:

    Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
