**06-2933-cr**
**United States v. Hamilton**

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: September 26, 2007                       Decided: August 15, 2008)

Docket No. 06-2933-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

HORATIO HAMILTON,

*Defendant-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, SOTOMAYOR, and KATZMANN, *Circuit Judges*.

Defendant appeals from the judgment of the United States District Court for the Southern District of New York convicting him of conspiracy to distribute and possess with intent to distribute marijuana. The defendant contends that the district court erred (1) in denying his motion to suppress evidence seized from a house in which he claimed a privacy interest on the ground that he lacked standing; (2) in receiving hearsay testimony; (3) in receiving expert opinion testimony without establishing the qualifications of the expert; (4) in instructing the jury on accomplice testimony without sufficient explanation of the witness's interest and motive to testify falsely; and (5) in placing the burden of showing withdrawal from a conspiracy on the defendant. The court of appeals

(Leval, *J.*) rejects the majority of the defendant's appellate claims but agrees that the defendant's motion to suppress could not properly be denied on grounds of lack of standing without a hearing. The court remands for further proceedings.

JOCELYN E. STRAUBER, Assistant United States Attorney, Southern District of New York (Jacob W. Buchdahl, Diane Gujarati, Assistant United States Attorneys, *of counsel*; Michael J. Garcia, United States Attorney, *on the brief*), New York, NY, for *Appellee*.

DIARMUID WHITE, White & White (Brendan White, *on the brief*), New York, NY, for *Defendant-Appellant*.

LEVAL, *Circuit Judge*:

Defendant Horatio Hamilton appeals from the judgment of the United States District Court for the Southern District of New York (Chin, *J.*) convicting him, after a jury trial, of conspiracy to distribute, and possess with intent to distribute, more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 846. Hamilton was sentenced to 25 years' imprisonment, ten years' supervised release, and the forfeiture of $10,000,000 plus any interest in a house associated with the conspiracy. He challenges the conviction on five grounds. He contends that the court erred (1) in denying his motion to suppress evidence seized from a house in which he claimed a privacy interest on the ground that he lacked standing; (2) in receiving hearsay testimony; (3) in receiving expert opinion testimony without establishing the qualifications of the expert; (4) in instructing the jury on accomplice testimony without sufficient explanation of the witness's interest and motive to testify falsely; and (5) in placing the burden of showing withdrawal from a conspiracy on the defendant.

2

While we reject most of the defendant's claims, we agree that the court could not properly deny the suppression motion on the grounds given without conducting a hearing. We remand for further proceedings.

**Background**

**I.      The Evidence**

The evidence presented at Hamilton's trial, seen in the light most favorable to the government, *see Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), showed the following.

*a.      Hamilton's 1999 Arrest*

On October 11, 1999, the Los Angeles Police Department arrested Hamilton and another man at Los Angeles International Airport with 3,640 pounds (about 1,650 kilograms) of marijuana. Hamilton and his partner had brought the drugs to the Continental Airlines cargo facility for shipment to Newark, New Jersey. The marijuana was wrapped in plastic and packed into styrofoam-lined cardboard boxes marked "Apel Electronics." At the time of his arrest, Hamilton was carrying the business card of Steve Garrigan, an employee of Box Brothers in Redondo Beach, California. He was also carrying a key card for the Le Parc Suites Hotel. At the time, Hamilton was using an alias – "Tony Dumars" – and was carrying an Ohio driver's license in that name.

A Continental Airlines employee testified that Hamilton had regularly shipped boxes marked "Apel Electronics" from Los Angeles to Newark for six months to a year preceding his arrest in October 1999. Steve Garrigan, the Box Brothers employee whose card Hamilton had carried, testified that during 1998 and 1999, a group of men with Carribean accents regularly purchased cardboard boxes with styrofoam lining, plastic wrap, packing peanuts, and spray adhesive. In 1998, Garrigan had sold them a large rubber stamp to print the words "Apel Electronics" on the boxes. The men continued to buy boxes from Garrigan until the middle of 2000.

Following his arrest, Hamilton was charged under the name of Tony Dumars for possession of the seized marijuana. On November 3, 1999, he was released on bail. A warrant was issued for his arrest when he failed to appear in court as ordered on March 28, 2000. On April 6, 2000, Hamilton acquired a new driver's license from the State of Florida, this time under the name "Romie Robertson."

b. *Hamilton's Drug Trafficking Subsequent to the 1999 Arrest*

Denise Pinnock, an accomplice witness, testified that Hamilton continued to engage in drug trafficking after his arrest in October 1999. Pinnock knew Hamilton because Hamilton was a partner in the marijuana business of Pinnock's boyfriend, Duwayne John. Pinnock met Hamilton, whom she knew by the alias Romie, in 1997 or 1998 at the Los Angeles house of a man named Ade. Pinnock explained that Hamilton packaged marijuana in Ade's house for shipment to the East Coast.

Pinnock's role in the conspiracy was to operate stash houses in the Bronx where marijuana was stored and distributed in smaller quantities to customers. She explained that the marijuana was shipped from Los Angeles to Newark and then driven in U-Haul vans to various locations in the Bronx. Pinnock testified that she saw Hamilton at one of the Bronx stash houses four or five times after she moved there in 1999. On one occasion, Hamilton was present when a shipment of marijuana came in; on another, he gave Pinnock three pounds of marijuana to sell on her birthday. Once, she saw Hamilton pay Duwayne John's brother Irky $500 in the basement of one of the stash houses after Irky helped unload a shipment.

On at least two occasions subsequent to Hamilton's arrest in October 1999, Pinnock observed Hamilton's involvement in receiving drug proceeds sent back to the West Coast. Pinnock herself delivered the cash to the Le Parc Suites Hotel in Los Angeles three or four times. On one occasion,

4

Pinnock saw Hamilton when he came to Le Parc Suites to meet Duwayne John the morning after Pinnock gave John the money. On another occasion, John called Pinnock to find what room she was staying in, and Pinnock could hear John relaying the information to Hamilton on a separate phone.

    c.    The Search of the Toquet House

On January 29, 2004, police officers from the City of Burbank in Los Angeles working on a drug interdiction task force came across a suspicious package at the Federal Express sorting facilities in the San Fernando Valley, California. The package was addressed to a "Mandy Cook"[1] at 17338 Toquet Drive (the "Toquet House") in Encino, California, a suburb of Los Angeles. The police called the contact number listed for Mandy Cook on the shipping label and reached the Le Parc Suites Hotel, but no person with the name Mandy Cook could be reached.

The officers decided to conduct a controlled delivery of the package. The Toquet House was located on a cul-de-sac in an upscale neighborhood. When the police arrived, they found five men standing in the driveway, one of whom was Hamilton, still using the name Romie Robertson. One of the police officers identified himself and asked the men if they knew who lived in the house. The men stated that they did not live in the house and did not know who did, but one of them told the officers that a "Shane Johnson" owned the house. One of the men[2] provided Shane Johnson's phone number. The police did not find anyone named Mandy Cook, the addressee of the FedEx package at the house.

---

[1] Both parties' briefs spell the recipient's name "Cooke," but the actual FedEx air bill says "Cook." GX 60.

[2] In the defense's opening statement, counsel asserted that "Mr. Hamilton told them [that the owner] was Shane Johnson and provided the telephone number to them to contact her." Tr. 40. The trial evidence did not show which of the men provided Johnson's name and telephone number. *See, e.g.*, Tr. 200-04.

The officers asked if there was anyone else inside the house, and received a response that someone named "Slick" was inside. The officers noticed that multiple doors to the house were open, including a sliding glass door. They called out to Slick and, upon receiving no response, entered the house. The officers came upon a man lying in bed in one of the bedrooms. He identified himself as "Mark Handsom" but later stated his true name was Raymond Foster. Foster consented to have the officers search the house. The search turned up three loaded firearms and approximately nine pounds of marijuana, as well as a pile of empty cardboard boxes, packing materials, ten to fifteen jars of petroleum jelly,[3] large plastic tubs that smelled of marijuana, and a photo identification in the name of "Mark Hibbert." The house had four bedrooms and was sparsely furnished, with a bed in three of the four bedrooms, and a couch, pool table, and TV in the living room.

While the police were conducting the search, a second package was delivered by UPS. It was addressed to an "Allison Ramsey" and bore the same addressee's phone number as was listed for Mandy Cook on the FedEx package. The package had been sent from a suburb of Atlanta, Georgia. The men said that they were expecting neither the FedEx nor the UPS package. Detective David Kleinfeld later obtained a search warrant for both packages, and found $36,000 cash in one and $35,000 in the other. The reactions of trained dogs to the smell of the currency was interpreted by the dog handlers as identifying the smell of narcotics.

After the UPS package arrived, two other men approached in a green Hummer, but quickly tried to drive off when they spotted the police in the cul-de-sac. The police stopped the vehicle and identified the driver as Ade Adeoye, the man Pinnock had identified as the owner of the house where she first met Hamilton. The police searched the vehicle but did not find any contraband.

---

[3] According to the testimony of one of the officers, narcotics traffickers use petroleum jelly in the belief that it throws off search dogs and prevents recovery of fingerprints.

6

The Toquet House was registered at the time of the search to Shane Johnson, who was Hamilton's girlfriend and the mother of his child.

d.       *Hamilton's Arrest in 2005*

In mid to late 2003, DEA Special Agent Eric Baldus attempted to locate Hamilton by checking Hamilton's criminal history and inquiring among informants. He testified that he received "information" that Hamilton was living with his girlfriend "Shane" on "Toquet Street." Tr. 597. Using a DEA database, Baldus later learned of the January 2004 search of the Toquet House, and discovered that someone named Romie Robertson who fit the description of Hamilton had been detained at the scene. In late 2004, Baldus obtained a photo of "Romie Robertson" from the Florida Department of Motor Vehicles and found that it was Hamilton.

On January 11, 2005, DEA agents arrested Hamilton at Los Angeles International Airport. Hamilton had just flown from Atlanta, Georgia – the place of origin of the UPS package sent to the Toquet House. Hamilton had purchased a first class ticket using over $1,200 in cash. At the time of his arrest, he was carrying the business card of a reservations manager at the Le Parc Suites Hotel.

e.       *Hamilton's Evidence*

Hamilton's lawyer conceded in his opening statement that Hamilton had participated in a marijuana distribution conspiracy at a much earlier time, but asserted that he had withdrawn from the conspiracy after his arrest in October 1999, and had thereafter devoted himself exclusively to his music production company. He claimed that, as the result of his withdrawal, his indictment, filed on January 18, 2005, was barred by the five-year statute of limitations. *See* 18 U.S.C. § 3282(a). The government countered that Hamilton never withdrew from the conspiracy, and that even if he did, the statute of limitations was tolled on March 28, 2000 because he was "fleeing from justice" as of that date when he failed to appear in court on the October 1999 arrest. *See* 18 U.S.C. § 3290.

7

Hamilton called two witnesses in an effort to corroborate his abandonment of the drug business for the music industry. The first was James Goring, a music executive who testified about Hamilton's involvement in the reggae business up until the time of his arrest. Goring admitted on cross, however, that Hamilton's biggest musical project – a series of concerts in Jamaica called "Sashi" – began in August 1999, which was prior to his arrest with over 3,600 pounds of marijuana in Los Angeles. Hamilton's second witness was Darrell Thompson, an entertainment lawyer who testified about work he had done relating to Hamilton's music production company, LOY.

## II. The District Court Proceedings

During the period before trial, the government provided Hamilton's attorneys with disclosures pursuant to Fed. R. Crim. P. 16, and the court adjudicated pretrial motions. Approximately five days before trial, the government provided further information to the defense pursuant to 18 U.S.C. § 3500. On January 9, 2006, the court was prepared to swear in the jury and begin trial. At that moment, Hamilton's attorney moved orally to suppress the evidence seized at the Toquet House on grounds that the police had entered the house without a warrant before receiving consent to conduct the search. The court exhibited understandable annoyance that the motion, perhaps requiring a hearing that would interrupt the progress of the proceedings, was made not only out of time but also at a highly inconvenient moment in the court's administration of the jury. Defense counsel offered the explanation that the government had not disclosed the pre-consent, warrantless entry until the recent delivery of the § 3500 material. Counsel then made an attorney proffer of facts supporting Hamilton's claim of a privacy interest in the house. The court found that these facts, even if true, were insufficient to give Hamilton standing to contest the search, and denied the motion without a hearing.

8

On January 17, 2006, the jury found Hamilton guilty of the marijuana conspiracy, and rendered a special verdict that he had not withdrawn from the conspiracy. The jury found him not guilty of the firearms offense.

**Discussion**

**I.    Hamilton's Standing to Contest the Search of the Toquet House**

Hamilton contends the district court erred in denying his motion to suppress the evidence seized from the Toquet House for lack of standing. He contends he established a reasonable expectation of privacy in the premises, which the district court was not at liberty to reject unless it determined at a hearing that the facts he alleged were untrue.

A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a "legitimate expectation of privacy" in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, *J.*, concurring); *accord United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990). A protected privacy interest has been found in a wide array of circumstances, ranging from ownership or regular occupancy of a home, *United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990), to status as an overnight guest in someone else's home, *Minnesota v. Olson*, 495 U.S. 91, 99 (1990), or even in someone else's hotel room, *United States v. Wilson*, 36 F.3d 1298, 1303 (5th Cir. 1994), to a rental storage unit, *United States v. Johns*, 851 F.2d 1131, 1136 (9th Cir. 1988), to one's business premises, *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968), including the desk drawers and file cabinets contained therein, *O'Connor v. Ortega*, 480 U.S. 709, 718-19 (1987), as well as the contents of one's office computer, *Leventhal v. Knapek*, 266 F.3d 64, 73 (2d Cir. 2001).

Hamilton proffered the following facts supporting his claim of a privacy interest in the Toquet House: (1) Hamilton had paid the $250,000 for the purchase of the house; (2) the purchase was registered in the name of Shane Johnson, who was identified by counsel in making the motion as Hamilton's "wife," his "common law wife," and the mother of his child; (3) Hamilton had free access "to come and go as he pleased"; and (4) he went there "two to three times a week for years." Tr. 12-13. Counsel noted that Hamilton "would be prepared to swear to [these facts] under oath." Tr. 13. In the ensuing colloquy, the Assistant United States Attorney ("AUSA") said, "I don't believe that they are married," and added that when the police arrived at the house, Hamilton had denied living there. In response to questioning from Judge Chin, Hamilton's attorney acknowledged that Hamilton did not have keys to the house, stating, "He had access, but not keys." Tr. 17. The district court then denied the motion, ruling that Hamilton had no more privacy interest than a mortgagee and therefore lacked standing to contest the search. The court said:

> He does not have standing. It would be no different than if a bank provided money for someone to purchase a house. The bank has access in the sense that it can send a representative from time to time to inspect, etc. Here, in light of all of the circumstances, he didn't have keys. He didn't have control of the facility. They were not married. He was not on the deed. The mere fact that he provided money, assuming that to be the case, is not sufficient to establish standing. You add to that the fact that [on the day the police searched] he denied that he lived there, I find that he does not have standing.

Tr. 17.

We disagree with the district court's view that Hamilton's claim to a privacy interest was no better than that of a mortgagee bank and therefore insufficient. While the burden was on Hamilton to establish a protected privacy interest, the court was obligated to credit the facts he asserted, and could not properly deny his motion for lack of standing unless the facts he asserted, seen in the light most favorable to Hamilton, were legally insufficient to sustain his burden. If the asserted facts, or

10

the inferences to be drawn from them, were contested, the court would need to hold a hearing to determine the contested issues. *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992).

Acceptance of Hamilton's allegations as true, construing them in the light most favorable to him, would yield a picture of one who has not only free and frequent access, but also probably effective control, and a solid expectation of privacy at the Toquet House.[4] Instead of considering the facts Hamilton asserted in the light most favorable to him, the court appears to have assessed the facts Hamilton asserted in the light least favorable to him. Although his allegations would support the inference that he effectively controlled the use of the facility, the court somehow concluded that "[h]e didn't have control of the facility." Tr. 17. Although his allegations explicitly stated that he had free access "to come and go as he pleased," the court somehow concluded that he had no more freedom of access than a mortgagee, entitled to make occasional inspections, because Hamilton admittedly did not *live* at the house, had no key, and was not named as owner on the deed. There is no authority for the proposition that one need live in the premises, or exercise control over them, in order to enjoy a privacy interest in those premises. Privacy interests have been found with respect to business premises and storage lockers. *See Chuang*, 897 F.2d at 649 ("It is well-settled that a corporate officer or employee in certain circumstances may assert a reasonable expectation of

---

[4] The picture suggested by his allegations (which, by the way, the trial evidence tended to confirm) would be of a transnational marijuana trafficker who purchased a house in the suburbs of Los Angeles to serve as a business location for bundling and packaging marijuana for shipment to the East Coast. Because he was wanted on a fugitive warrant, and to avoid exposure to criminal liability in case the unlawful use of the house came to the attention of law enforcement, he put the deed in the name of someone he believed he could control and trust – his wife, or common law wife, and the mother of his child. He kept the house staffed with personnel of the business, who packaged merchandise there for shipment and received bundles of cash representing the proceeds of sales. He had free access to come and go as he pleased and did so with frequency. He needed no key to obtain access as the house was occupied by personnel of his business operations who were responsive to his wishes.

11

privacy in his corporate office, and may have standing with respect to searches of corporate premises and records."); *Johns*, 851 F.2d at 1136 (finding reasonable expectation of privacy in rented storage space). They have been found where one was merely a guest at the premises. *Olson*, 495 U.S. at 99. Nor has possession of a key or a deed or lease in one's own name been deemed indispensable to establishment of a privacy interest, where the claimant's understanding with those in charge of the premises was the basis of the expectation of privacy. *Id.*; *see also Wilson*, 36 F.3d at 1303. We conclude that the court erred in failing to draw reasonable inferences in Hamilton's favor from the facts he alleged and in denying Hamilton's motion without a hearing on the ground that he did not have a privacy interest protected by the Fourth Amendment.

It does not necessarily follow, however, that the motion to suppress should have been granted. The district court, relying on an invalid reason to deny the motion, did not reach other possible reasons for denial of the motion. For example, the court expressed frustration that the motion, possibly requiring a hearing, was not made until the start of trial – apparently beyond the time set by the court for motions. Counsel offered as an excuse that he had not learned of the warrantless entry until the government's recent disclosure of the § 3500 material. However, it appears that the § 3500 material was disclosed five days prior to the making of the motion. We do not know, assuming the court would accept counsel's reason for not having made the motion within the time set by the court for motions, whether it would also accept the additional five-day delay following delivery of the § 3500 material, and excuse the failure to support the motion with an affidavit attested by Hamilton. *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) ("[W]ithout an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest." (internal citation and quotation marks omitted)). Nor can we know whether, upon conducting a hearing, the court might find either that Hamilton failed to sustain the facts asserted by

12

his counsel, or that Raymond Foster's consent to the search overrode the warrantless entry. *See United States v. Snype*, 441 F.3d 119, 134-35 (2d Cir. 2006) (holding that taint of illegal entry by police had dissipated before consent was given).[5]

We accordingly simply rule that the reason given by the court for the denial of the motion to suppress cannot stand, and we remand for further consideration of the motion, leaving it to the district court to consider in the first instance the various arguments that may be made for and against the motion.

**II.     Hearsay Testimony by Government Witness**

---

[5] The government argues that Hamilton forfeited standing to challenge the search because, when asked by the police officers, he denied living in the house. Government Br. at 17-18. It is true, we have stated that "an otherwise legitimate privacy interest may be lost by disclaiming or abandoning property, especially when actions or statements disavow any expectation of privacy." *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991). The *Torres* case, however, differs significantly from these facts. The defendant in *Torres* had expressly disclaimed any interest in the bag which the border patrol agent then searched. She told the agent that "he could look into the bag, that it wasn't her bag, she didn't care." *Id.* at 607. According to the police report on which the government's contention relies, when Hamilton and the other men were approached by the police in the driveway of the Toquet House, they denied either living in the house or knowing who did – apparently truthful answers. Hamilton did not live in the house. Indeed it appears this scantily furnished house did not serve as anyone's residence but served rather as a business facility for packing and shipping bundles of marijuana and receiving shipments of cash. We do not see why Hamilton's denial that he lived in the house or knew who did, especially if truthful, should be considered equivalent to a "disavow[al of] *any* expectation of privacy." *Torres*, 949 F.2d at 608 (emphasis added). In many circumstances one may possess a privacy interest in certain premises without living there. *See New Hampshire v. Sodoyer*, 931 A.2d 548, 551 (N.H. 2007) (defendant's statement that he did not live in the house searched did not constitute disavowal of *any* privacy interest in the house). A number of other courts have ruled, sometimes on reasoning that differed slightly from ours, that a defendant's denial to the investigating police that he lived at the premises did not constitute a forfeiture of a privacy interest. *See United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000); *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). *But see United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991) (defendant's statement that he did not live in the residence constituted denial of any relationship with the home and thus deprived him of standing); *Tennessee v. Ross*, 49 S.W.3d 833, 842-43 (Tenn. 2001) (defendant forfeited a privacy interest in a hotel room by telling police that the room key in his sock was not his).

Hamilton claims that the testimony of Special Agent Eric Baldus that he had learned that the defendant was "living with someone named Shane, his girlfriend, somewhere in California [on] Toquet Street[,]" was inadmissible and prejudicial hearsay. The government responds that this evidence was properly received not for the truth of what was stated but for the non-hearsay purpose of showing the government's investigative efforts to find the defendant following his failure to appear in court after his 1999 arrest at the Los Angeles airport. This, the government argues, became relevant to rebut the defendant's contention that his indictment in 2005 was not within the five years allowed by the statute of limitations following the termination of his involvement in the marijuana conspiracy. We agree with the government.

In his opening statement to the jury at the start of trial, Hamilton's attorney conceded that Hamilton had been a part of a marijuana conspiracy up to the time of his arrest at the Los Angeles airport in 1999, but asserted that he had withdrawn from the conspiracy at that time and had thereafter devoted himself to a career promoting Reggae music. Defense counsel asserted that, because Hamilton ceased to be part of the conspiracy in 1999, the indictment filed against him in 2005 was not within the five years allowed by the statute of limitations. 18 U.S.C. § 3282. While the government sought to counter this contention in part by evidence that Hamilton continued to participate in the marijuana trafficking conspiracy after 1999, the government also undertook to show that, even if the jury should find that he had withdrawn in 1999, the five-year period allowed for his indictment did not expire prior to his indictment because it was tolled during the time that Hamilton was "fleeing from justice." 18 U.S.C. § 3290 ("No statute of limitations shall extend to any person fleeing from justice.").

This court has held that "'the nature and the extent of the efforts of government agents to locate the defendant is one factor to consider in determining whether . . . the defendant was [fleeing

14

from justice].'" *United States v. Florez*, 447 F.3d 145, 152 (2d Cir. 2006) (quoting *United States v. Greever*, 134 F.3d 777, 780 n.1 (6th Cir. 1998)). In accordance with these authorities, the government contends that, in order to persuade the jury that the statute of limitations was tolled, it needed to show the course of its investigations that eventually led to the capture of the defendant.

The government accordingly called Agent Baldus, the case agent or lead investigator, to testify to his efforts to find the defendant. Baldus stated that, beginning in 2003, he had been "asking cooperating individuals if they kn[e]w where he was." Tr. 596. Eventually he received some information. The AUSA then asked, "Without telling me what the information was, did this have anything to do with his location or his whereabouts?" Tr. 597. Baldus affirmed that it was about the defendant's location and was permitted by the court to answer, whereupon he gave the answer which is the subject of this claim – that he learned the defendant was living with Shane, his girlfriend, in California on Toquet Street.

The AUSA then elicited how that piece of information eventually led to the defendant's apprehension. At first, with only the name of Shane and a street name, Baldus had insufficient information with which to do anything. He continued, however, to inquire of cooperators and eventually was given a telephone number. A subpoena (presumably to the telephone company) revealed an address for that telephone number, which was 17338 Toquet Drive in Encino, California. Checking that address against criminal investigation databases revealed the police report of the incident in January 2004 at 17338 Toquet Drive. The report included descriptions of the persons encountered by the police at the Toquet House, one of which matched the description Baldus had for the defendant. That individual had used the name Romie Robertson. The agent knew that the defendant had used the name Romie. The report also gave the number of Romie Robertson's Florida driver's license. The agent obtained a photo from the Florida motor vehicle authority, which

15

confirmed that Horatio Hamilton and Romie Robertson were the same person. An analysis of telephone records related to the Toquet address resulted in the identification of a cell phone which had previously been used in the Los Angeles area and was now making calls in the Atlanta area. Further inquiry of cooperators concerning Romie Robertson produced information that he would be flying from Atlanta to Los Angeles on a particular Delta Airlines flight. Baldus went to the Los Angeles airport and arrested the defendant as he deplaned.

We agree with the government that Baldus's testimony, including his report of the information he received that the defendant was living with his girlfriend Shane on Toquet Street, was relevant to the government's efforts to locate Hamilton in support of the contention that he was a fugitive, whose limitation period was tolled while he was in flight from justice. The report linking him to the Toquet House was relevant not for the truth of what was stated in the report, but rather for the non-hearsay purpose of showing the information Baldus received and how he used that information in his continuing efforts to locate the defendant. These efforts to find the defendant became pertinent when, at the start of trial, the defendant raised the contention that he had withdrawn from the conspiracy in 1999 with the consequence that his indictment in 2005 was untimely.

The fact that the evidence was admissible to support the government's contention that Hamilton was in fugitive status does not end the inquiry. It is indisputable that Baldus's testimony also included incriminating hearsay information. The jury had heard evidence that at the Toquet House the police had found nine pounds of marijuana with packing materials, guns, and tens of thousands of dollars in cash shipped in bundles from Atlanta. The hearsay information communicated to Baldus that Hamilton was living in the house where the police had found such evidence of trafficking in marijuana undoubtedly had a capacity to prejudice Hamilton.

16

Under Rule 403 of the Federal Rules of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *see also United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994). We accordingly must consider whether the probative value of this evidence for its proper purpose was "substantially outweighed" by unfair prejudice resulting from its hearsay content to such an extent that its admission was an abuse of the court's discretion. We conclude that it was not.

There was already substantial, properly admitted evidence connecting Hamilton to the Toquet House, including that he was found there by the police at the very time when they discovered the marijuana there and the bundles of cash from Atlanta were delivered. In addition, Hamilton conceded that he was "hanging around" there that day, Tr. 39, and that the house was owned by his girlfriend. The potential harm to the defendant from the hearsay that at some unspecified time in or after 2003 he was living in that house with his girlfriend was thus substantially diminished. The standard of Rule 403 for the exclusion of the government's relevant evidence was not met.

**III.    Hamilton's Other Claims**

Hamilton's other claims require little discussion.

*a.  The court's charge on accomplice testimony.* Hamilton faults the court's charge on accomplice testimony, contending that it failed to warn the jury adequately of the accomplice witness's interest and motive to testify falsely. We disagree. The court's charge on this issue included the following:

> Because of the possible interest an accomplice may have in testifying . . . , the accomplice's testimony should be scrutinized with special care and caution. . . . In evaluating the testimony of an accomplice witness, you should ask yourselves whether the accomplice would benefit more by lying or by telling the truth. Was the testimony made up in any way because the witness believed or hoped that he or she would somehow receive favorable treatment by testifying falsely? Or did the witness

17

believe that his or her best interests would be served by testifying truthfully? If you believe that the witness was motivated by hopes of personal gain, was the motivation one that would cause the witness to lie, or was it one that would cause him or her to tell the truth? Did this motivation color the testimony?

Tr. 846-47.

The court's formulation was more or less verbatim to that noted with approval in Leonard B. Sand et al., *Modern Jury Instructions* ¶ 7.01, Instruction 7-5 (2005), and was considerably more favorable to the defendant than the charge we upheld in *United States v. Vaughn*, 430 F.3d 518, 523-24 (2d Cir. 2005). Here, unlike in *Vaughn*, the district court pointed out the specific risk that the accomplice might falsify or color her testimony in the hopes of "personal gain" in the nature of "favorable treatment." Tr. 847. We find no merit in the defendant's claim.

*b. Burden of proof on withdrawal from a conspiracy*. Hamilton contends the court erred in placing the burden of proof on the defendant to show withdrawal from a conspiracy. He argues that the Supreme Court's discussion in *Dixon v. United States*, 548 U.S. 1 (2006), undercuts this court's long-standing precedent that withdrawal from a conspiracy is an affirmative defense which the defendant must prove by a preponderance of the evidence. *See United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005) (citing *United States v. James*, 609 F.2d 36, 41 (2d Cir. 1979)). We disagree.

In *Dixon*, the defendant asserted a duress defense at her trial for receiving a firearm while under indictment and making false statements in connection with the acquisition of a firearm. Consistent with Fifth Circuit precedent, the trial judge instructed the jury that the defendant bore "the burden of proof to establish the defense of duress by a preponderance of the evidence." Dixon argued that federal law requires the government to bear the burden of disproving her defense beyond a reasonable doubt. *Dixon*, 548 U.S. at 5. Her theory was that, because the prosecution must prove all the elements of the crime beyond a reasonable doubt, *In re Winship*, 397 U.S. 358, 364 (1970),

18

it must also disprove a defense that controverts one of those elements. In her case, she claimed that duress controverts or negates the *mens rea* element of the crime with which she was charged, and that the prosecution was thus bound to disprove duress. The Supreme Court rejected this argument on grounds that duress does not negate *mens rea*, but rather "allows the defendant to 'avoid liability . . . because coercive conditions or necessity negates a conclusion of guilt even though the necessary *mens rea* was present.'" *Dixon*, 548 U.S. at 7 (quoting *United States v. Bailey*, 444 U.S. 394, 402 (1980)).

Hamilton claims, first, that the Supreme Court implicitly accepted Dixon's argument that a defense which controverts an essential element must be disproved by the prosecutor beyond a reasonable doubt, and second, that unlike duress, withdrawal from a conspiracy *does* negate an element of the substantive offense: namely, membership in the conspiracy. He notes that the Fourth and Seventh Circuits, in pre-*Dixon* cases, have so held. *See United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989); *United States v. Read*, 658 F.2d 1225, 1236 (7th Cir. 1981).

The prosecution must establish three elements in order to prove a conspiracy: (1) an agreement between two or more persons to commit an unlawful act; (2) the defendant's knowing and intentional membership in the conspiracy; and (3) the commission of an "overt act" in furtherance of the conspiracy. *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002). The defendant's eventual withdrawal from the conspiracy negates none of these elements. To the contrary, a defendant's withdrawal from a conspiracy tends to confirm, rather than deny, his prior membership in it. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) (explaining that membership in a conspiracy is "presumed to continue . . . unless the defendant proves . . . that he look affirmative steps to withdraw"). Even assuming that the *Dixon* opinion should be construed as accepting Dixon's

19

proposition with respect to the burden of proof as to defenses which negate an element of the offense, on which we express no view, it would have no application to this case. Accordingly, we find nothing in *Dixon* that would lead us to disturb the long-established precedent of this court placing the burden of proving withdrawal on the defendant.

*c. Expert opinion testimony*. Finally, Hamilton contends that the district court erred in admitting testimony by a law enforcement witness because (1) it was based on specialized knowledge, and thus did not qualify as lay opinion testimony, and (2) the government did not demonstrate its admissibility as expert opinion testimony.

Detective John Cater of the Los Angeles County Sheriff's Department, one of the officers involved in the Toquet House search, gave general testimony about narcotics trafficking, based on his fourteen years' experience as a narcotics detective. Cater described Encino – the location of the Toquet House – as a place well-suited for a base for packing and shipping drugs because it is a quiet, residential area with little police presence. He also characterized Atlanta – the city from which the UPS package containing $35,000 in cash had been sent and from which Hamilton was arriving when he was arrested at the Los Angeles airport – as "a destination place for narcotics to come from the West Coast and go to the East Coast." Tr. 245. Hamilton contends that this line of testimony was "expert opinion masquerading as lay opinion." Appellant's Br. at 38.

Although Hamilton may be correct that Cater's testimony rested on "specialized knowledge" within the meaning of Rule 702, s*ee* Fed. R. Evid. 702 (providing for testimony by experts on the basis of "scientific, technical, or other specialized knowledge"), so that the court needed to pass on his qualifications as an expert and the reliability of his testimony, and so that the government was obligated to provide expert disclosure pursuant to Fed. R. Crim. P. 16(a)(1)(G), any error was

harmless. On direct examination, the government firmly established the officer's relevant experience, his qualifications, and the reliability of his evidence. Hamilton shows no prejudice resulting from the failure to make pretrial disclosure of Cater's generalizations. *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997) ("When the government has failed to comply with Rule 16, the district court has broad discretion to determine what remedial action, if any, is appropriate. . . . A reversal will only be warranted if the nondisclosure results in substantial prejudice to the defendant." (internal citation and quotation marks omitted)).

## Conclusion

For the foregoing reasons, the case is remanded for further proceedings consistent with this opinion.