In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-4332 & 06-4334

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE A. AMARAL-ESTRADA and
EVARARDO LIRA-ESQUIVEL,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 CR 43—**Sarah Evans Barker**, *Judge.*

———————

ARGUED SEPTEMBER 27, 2007—DECIDED DECEMBER 5, 2007

———————

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendants-Appellants Jose A. Amaral-Estrada and Evarardo Lira-Esquivel appeal from the district court's denials of their respective Motions to Suppress Evidence. For the reasons stated below, we affirm the district court's denial of the motions.

## I. Background

On May 9, 2005, agents of the Drug Enforcement Agency ("DEA") were conducting surveillance on 5352 W. Deming Place in Chicago, Illinois in search of Freddy Adan Sosa-

Verdeja for whom an arrest warrant had been issued. Sosa-Verdeja was a fugitive wanted in connection with federal drug-related crimes which involved transporting cocaine with cars.

On May 3, 2005, the DEA sought and received a court order from a magistrate judge for the application and use of a pen register and trap-and-trace device, and to determine certain telephone information using the cellular telephone number of Sosa-Verdeja's phone. The DEA's surveillance involved tracking cellular site information on Sosa-Verdeja's cell phone, which turns a cell phone's emitted signal, as it searches for a cell tower, into a tracking device. This surveillance allowed DEA agents to pinpoint the location of the cell phone at one of the three residential units located at 5352 W. Deming Place.

While the agents conducted surveillance on 5352 W. Deming Place on May 9, 2005, DEA Special Agent Christopher O'Reilly was informed by another law enforcement officer that a Chrysler M300 had been seen in the alley north of Deming Place from Long Street and the driver of that car resembled Sosa-Verdeja.[1] The Chrysler M300 was driven by Amaral-Estrada with a male passenger. Amaral-Estrada pulled out of the alley and continued for about a block before parking the car on Drummond Street. Agent O'Reilly followed Amaral-Estrada from the alley by 5352 W. Deming Place to Drummond Street, where he observed Amaral-Estrada and his passenger get out of the car, look around as if to see if they were being watched or followed, and then proceed to walk back around the block towards 5352 W. Deming Place.

About fifteen minutes after Amaral-Estrada and his passenger had exited the vehicle, Agent O'Reilly parked his car, got out and identified himself as a police officer

---

[1] The DEA agents conducting the surveillance had been given a wallet-sized photo of Sosa-Verdeja to identify him.

and requested identification from the two men. Agent O'Reilly detained Amaral-Estrada to conduct a pat-down search of his person, during which Agent O'Reilly removed all of the items from Amaral-Estrada's pockets, including cell phones and a set of Chrysler keys. Agent O'Reilly then inspected the Mexican driver's license and voter registration card provided by Amaral-Estrada, both of which bore the name of Amaral-Estrada, not Sosa-Verdeja. At this time, Amaral-Estrada stated that he did not speak or understand English, so Agent O'Reilly and the other DEA Agents that had arrived at the scene contacted Spanish-speaking DEA Task Force Officer Mario Elias via a two-way radio so that Officer Elias could translate Agent O'Reilly's questions into Spanish and Amaral-Estrada's answers into English. In answering these questions, Amaral-Estrada replied that he and his passenger were walking around looking for an apartment to rent in the area, and that they came from Bensonville, Illinois. When Agent O'Reilly asked them how they got to Chicago from Bensonville, they could not provide an answer. Amaral-Estrada also denied any knowledge of the Chrysler M300 that Agent O'Reilly saw him driving minutes earlier.

At the evidentiary hearing, Amaral-Estrada stated that he never denied driving the Chrysler M300 and that he simply stated that he did not own the car, but that he told Agent O'Reilly (via Officer Elias's translation) that he had driven the car to Chicago. Amaral-Estrada further explained at the hearing that Sosa-Verdeja had lent him the car about a week earlier and that Sosa-Verdeja had instructed him to drive to a specific Walgreens, go inside, and that while he was inside, someone would enter the back seat of the car and put something in it. Amaral-Estrada testified that he did as he was told by Sosa-Verdeja, and indeed upon his return to the car after visiting Walgreens, a large black duffel bag was in the back seat. Amaral-Estrada also testified that he did not

care about the bag in the back seat because it was not his bag and it was not his car.

Returning to the sequence of events of May 9, 2005, Agent O'Reilly detained Amaral-Estrada and his passenger for lying when Amaral-Estrada denied any connection with or knowledge of the Chrysler M300 that he had seen Amaral-Estrada drive, park, and exit prior to stopping him on foot.

Agent O'Reilly placed Amaral-Estrada in the back seat of his police car and drove back to where the Chrysler M300 was parked. Agent O'Reilly then surveyed the Chrysler M300 for about thirty or forty minutes because he suspected that a "drug drop" was underway.[2] When no activity involving the Chrysler M300 occurred, Agent O'Reilly approached the car and saw the black duffel bag on the back seat. Agent O'Reilly admitted that nothing about the exterior of this bag indicated that it was filled with contraband. Using the two-way radio again so that Officer Elias could translate for Agent O'Reilly and Amaral-Estrada, Agent O'Reilly asked about the bag. Amaral-Estrada denied that the bag belonged to him and again denied that he had ever been inside the car. Using the Chrysler keys obtained from Amaral-Estrada's pocket during the pat-down search, Agent O'Reilly unlocked the Chrysler car door using the remote entry device.[3]

---

[2] A drug drop is an event in which drug-trafficking organizations leave contraband in an inconspicuous location for someone else to pick up, such as a parked car in this case. Agent O'Reilly testified that he has witnessed approximately twenty drug drops during his career in law enforcement.

[3] At the evidentiary hearing, Amaral-Estrala stated that he could not understand everything that was being asked by Officer Elias over the two-way radio because the radio kept cutting out.

After Amaral-Estrada had again denied any connection to the car, Agent O'Reilly opened the car door and looked inside the duffel bag. The bag contained U.S. currency in an amount later determined to be $254,947.00. After discovering its contents, Agent O'Reilly removed the bag from the car. Shortly thereafter, Officer Elias arrived at the scene and read Amaral-Estrada his *Miranda* rights in Spanish.

With Amaral-Estrada in custody, Agent O'Reilly and Special Agents Gerald Dooley and Sam Ginelli returned to the apartment building at 5352 W. Deming Place where the agents decided to do "knock and talks" with the residents to seek consent to search the residential units of the building pinpointed by Sosa-Verdeja's cell phone signal. The agents entered through the unlocked common entrance that led them to the common foyer and staircase. They proceeded down to the basement unit and knocked, but no one answered. The agents then went to the first-floor unit and knocked, but again no one answered. The agents then went to the second floor apartment where, from the hallway, they could hear a television playing inside. Agent O'Reilly knocked on the door, and Maria Leticia Verdeja-Sanchez answered.

From this point on, the testimony of the parties varies greatly. Verdeja-Sanchez says that as soon as she unlocked the apartment door, the agents pushed it open, held her at gun point, handcuffed her, and threw her to the floor.[4] According to the agents, Verdeja-Sanchez opened the door slightly and Agent O'Reilly asked her if she spoke English, to which she responded "a little."

---

[4] Prior to her evidentiary hearing, Verdeja-Sanchez's contended (in her fact recitals in court filings) that after opening the door a little, the agents pushed the door open so quickly that it knocked her to the floor.

Agent O'Reilly then asked her if there was anyone else in the apartment, to which she answered "no." Next, Agent O'Reilly showed Verdeja-Sanchez the wallet-sized picture of Sosa-Verdeja and asked if she knew the man in the picture. She again responded "no."[5] In viewing the picture, Verdeja-Sanchez leaned forward to see the picture more clearly and the apartment door was opened wider, providing the agents with a broader view into the apartment. With this broader view, the agents were able to see a person's arm on the couch inside the apartment. Agent O'Reilly then pushed open the door, entered the apartment, approached the man on the couch, and asked him to present identification.[6] That man was Defendant-Appellant Lira-Esquivel, the husband of Verdeja-Sanchez.

At the same time that Agent O'Reilly entered the apartment, Agent Dooley called Sosa-Verdeja's cell phone number that the agents were monitoring to locate Sosa-Verdeja. Immediately, a cell phone on the coffee table in the apartment began to ring. At this point, the other agents entered the apartment and detained Lira-Esquivel and Verdeja-Sanchez so they could conduct a protective sweep of the apartment to determine if anyone else, particularly Sosa-Verdeja, was in the apartment. When they found no one else in the apartment, one of the agents searched the couch area where Lira-Esquivel had been sitting, and discovered a loaded nine millimeter handgun tucked into the cushions.

About twenty minutes later, Officer Elias arrived at the apartment to translate for the agents, Lira-Esquivel, and Verdeja-Sanchez. In Spanish, Officer Elias advised Lira-

---

[5] Verdeja-Sanchez was in fact Sosa-Verdeja's mother.

[6] It is undisputed that the agents did not have a search warrant for the apartment at the time they entered it.

Esquivel and Verdeja-Sanchez of their *Miranda* rights both orally and in writing, and presented them with consent forms to search the apartment. Lira-Esquivel asked if he was required to agree to the search of the apartment; Officer Elias told him in Spanish that he could refuse, but that the agents could seek a search warrant. Lira-Esquivel then agreed to allow the search and signed the Spanish consent to search form. Verdeja-Sanchez also signed the consent to search form, but claims she did so because she was scared.

After receiving consent to search the apartment and conducting a thorough search, the agents recovered about twelve kilograms of cocaine and more than 300 used kilogram wrappings for cocaine from the premises. Several notebooks of drug ledgers and $20,000 in U.S. currency were also found.[7] Lira-Esquivel and Verdeja-Sanchez were both taken into custody, although Verdeja-Sanchez was later released.

On July 12, 2005, a five-count superceding indictment was filed in the Southern District of Indiana. Count One charged Defendants-Appellants Amaral-Estrada and Lira-Esquivel with conspiracy to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II Narcotic Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Both Amaral-Estrada and Lira-Esquivel moved to suppress the evidence obtained during their arrests and the searches of the car and apartment, respectively, alleging Fourth Amendment violations. Specifically, Amaral-Estrada claimed that the DEA

---

[7] Agent O'Reilly also interviewed the apartment's landlord, who stated that he rented the apartment and garage to Sosa-Verdeja. The landlord was able to identify the man in the wallet-sized photo as Sosa-Verdeja.

agents lacked probable cause to search the car, or stop, question, detain, and arrest him. Lira-Esquivel also argued that the DEA agents lacked probable cause to enter his apartment and to search and arrest him. He also challenged the government's use of the cell site information to track Sosa-Verdeja's cell phone.

In an unpublished opinion dated June 30, 2006, the district court found that Amaral-Estrada lacked standing to challenge the search of the Chrysler M300 because he did not have a legitimate privacy interest in the car under the facts presented by the parties. The district court also found that the agents had reasonable suspicion to stop and question Amaral-Estrada to determine whether he was Sosa-Verdeja. Based on Amaral-Estrada's failure to present documentation of his legal status in the United States, in addition to his lie to the agents about not having knowledge of the Chrysler M300 they saw him park just moments earlier, the district court concluded that the agents had probable cause to suspect that Amaral-Estrada was illegally in the country and that he had lied to federal agents. The district court held that the agents acted constitutionally when they detained and arrested him.

The district court similarly found that Lira-Esquivel lacked standing to challenge the government's surveillance methods used on a cell phone that was not his. Finally, the district court determined that, based on the totality of the circumstances present at the time of the apartment entry, the agents had probable cause to enter the apartment and search Lira-Esquivel. Specifically, the district court credited the agents' testimony that they saw the arm of another person on the couch shortly after Verdeja-Sanchez had told them that no one else was in the apartment, which again amounted to probable cause for lying to an agent.

After the district court denied their respective Motions to Suppress Evidence, both Defendants-Appellants entered conditional guilty pleas maintaining their rights to appeal the suppression rulings. They were each sentenced to ninety months' imprisonment.

## II. Discussion

Amaral-Estrada appeals the district court's holdings (1) that he lacked standing to assert a Fourth Amendment violation with regard to the search of the Chrysler M300; (2) that there was probable cause to stop, question, detain, and arrest him; and (3) that the search of the vehicle was supported by probable cause.

Lira-Esquivel appeals the district court's findings (1) that the agents had probable cause to enter the apartment and search and arrest him; (2) that he lacked standing to challenge the government's use of cell site information to track a cell phone in his apartment; and (3) that the arrest warrant for Sosa-Verdeja satisfied the search warrant and probable cause requirements necessary to obtain the cell site information for the cell phone found in his apartment.

We review the district court's factual findings for clear error and questions of law or mixed questions *de novo*. *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006); *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005). Since the resolution of a motion to suppress is a fact-specific inquiry, we give deference to the credibility determinations of the district judge, who had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing. *Parker*, 469 F.3d at 1077; *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998). In other words, "a district judge's credibility determination will not be disturbed unless it is completely

without foundation." *United States v. Huebner*, 356 F.3d 807, 812 (7th Cir. 2004) (quoting *United States v. Salyers*, 160 F.3d 1152, 1162 (7th Cir. 1998)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction a mistake has been committed." *United States v. Veras*, 51 F.3d 1365, 1370 (7th Cir. 1995).

### A.  Issues Raised by Amaral-Estrada

### 1.  The Search of the Chrysler M300

Amaral-Estrada contends that the district court erred in finding that he lacked standing to challenge the search of the Chrysler M300. Specifically, the district court found that because Amaral-Estrada had borrowed the car from Sosa-Verdeja and that Amaral-Estrada knew others would be entering the car while he possessed it, Amaral-Estrada lacked an expectation of privacy in the car. This was evidenced by the Walgreens incident where the duffel bag was placed in the car.

A criminal defendant cannot assert a privacy interest on behalf of someone else. *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006). Rather, a defendant charged with a crime of possession can only claim the benefits of the exclusionary rule if his own Fourth Amendment rights have been violated. *Id.* (citing *United States v. Salvucci*, 448 U.S. 83, 85 (1980)). A driver who borrows a car with the owner's permission may acquire standing to challenge the search of the vehicle only if he can establish that he has a legitimate expectation of privacy in it or in the area searched. *United States v. Jackson*, 189 F.3d 502, 508 (7th Cir. 1999). A reasonable expectation of privacy is present when (1) the defendant exhibits an actual or subjective expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable. *Mendoza*,

438 F.3d at 795 (citing *Katz v. United States,* 389 U.S. 347, 361 (1967)); *see Kyllo v. United States*, 533 U.S. 27, 33 (2001).

Amaral-Estrada failed to manifest any sort of actual or subjective expectation of privacy. Instead, Amaral-Estrada possessed the car for the purposes of transporting contraband, such as the U.S. currency seized from the back seat. His expectations while using the car were that others would enter the vehicle, taking and/or leaving items therein. Furthermore, when the federal agents asked Amaral-Estrada about the vehicle, Amaral-Estrada denied any knowledge of the car. Amaral-Estrada also testified that he did not care about the bag in the back seat of the Chrysler M300 because it was not his bag and not his car. Under these facts reasonably relied upon by the district court, Amaral-Estrada failed to exhibit any legitimate privacy interest in the Chrysler M300 and therefore lacks standing to challenge the search of the vehicle; therefore we need not address his third issue on appeal as to whether there was probable cause to search the Chrysler M300.

### 2. The *Terry* Stop and Subsequent Arrest of Amaral-Estrada

Amaral-Estrada's second argument on appeal is that the federal agents lacked probable cause to stop, question, detain, and arrest him. We review this issue *de novo*. As Amaral-Estrada's brief recognized, under *Terry v. Ohio*, police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. 392 U.S. 1, 30 (1968); *United States v. Wimbush,* 337 F.3d 947, 949 (7th Cir. 2003). "Reasonable suspicion" must be based on some objective manifestation

that the suspect is involved in criminal activity. *Wimbush*, 337 F.3d at 949. The likelihood of criminal activity need not rise to probable cause and falls well short of a preponderance of the evidence standard. *Id.* at 949-50 (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Courts examine the reasonableness of a stop based on the totality of the circumstances known to the officer at the time of the stop. *Id.* at 950; *United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002). Probable cause to make an arrest exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent man's belief that the suspect has committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005).

When the federal agents decided to follow Amaral-Estrada in the Chrysler M300, they did so suspecting that Amaral-Estrada was the fugitive, Sosa-Verdeja. While following Amaral-Estrada, the agents saw him exit the Chrysler M300, and walk around the neighborhood, frequently looking over his shoulder as if to see if someone was following him. Based on their suspicion that he might be Sosa-Verdeja and that a drug drop might be underway, Agent O'Reilly stopped Amaral-Estrada and asked for identification. While this may have satisfied the agents' reasonable suspicion as to Amaral-Estrada's identity, probable cause was established for his arrest when Amaral-Estrada lied to them, a violation of 18 U.S.C. § 1001 (false statements to a federal agent). Specifically, Amaral-Estrada denied any knowledge of the Chrysler M300 that Agent O'Reilly had just seen him park and exit moments earlier. For this reason alone, the agents had probable cause to detain and arrest Amaral-Estrada. The district court's denial of Amaral-Estrada's Motion to Suppress Evidence is therefore affirmed.

**B. Issues Raised by Lira-Esquivel**

**1. Probable Cause to Enter the Apartment and Search and Arrest Lira-Esquivel**

Lira-Esquivel appeals the district court's finding that the agents had probable cause to enter his private residence, and to search and arrest him.[8] Specifically, Lira-Esquivel contends that the district court clearly erred in finding that the agents at the door of Lira-Esquivel's apartment could have seen the arm of a person on the couch based on the positioning of the door in relation to the couch. Lira-Esquivel also claims that Verdeja-Sanchez could not have understood the agents' question of whether anyone else was in the apartment, despite her statement that she understood English "a little" and responding "no" to the question. Lira-Esquivel hinges his argument on the district court's factual determinations that he asserts were clearly erroneous. Lira-Esquivel does not contest that probable cause existed to enter the apartment, and to search and arrest Lira-Esquivel under the facts determined to be true by the district court. We review this purely factual challenge for clear error only. *See Parker*, 469 F.3d at 1077.

Lira-Esquivel's first factual challenge is whether the couch was visible from the agents' position at the doorway of the apartment. It is undisputed that the door was open wider than the pictures presented to the district court illustrated, and that the couch was certainly visible when the door was opened all the way. Based on the testimony provided at the evidentiary hearing, it was not clearly erroneous for the district court to conclude that the door

---

[8] Lira-Esquivel makes no direct argument why the agents lacked probable cause to search and arrest him, and instead focuses his argument on the lack of probable cause to enter his apartment.

was open far enough for the agents to see the couch. In other words, it was not clear error for the district court to believe the testimony of the agents. The evidence presented by Lira-Esquivel, when taken as true, may question the accuracy of the agents' statements, but it does not definitively negate them. Therefore, the district court did not clearly err in determining that the agents could have seen an arm on the couch, and that the agents then concluded that Verdeja-Sanchez had lied to them.

Turning to Lira-Esquivel's second factual challenge, that Verdeja-Sanchez could not have understood the agents' questions, we again find no error. At the time the agents knocked at Lira-Esquivel's door, the agents were lawfully in the unsecured common areas of the multi-unit building. When Verdeja-Sanchez opened the door to the agents, she appeared to understand their question regarding her ability to speak English, appropriately responding "a little." She also provided a coherent and appropriate—even if untruthful—response of "no" to the question of whether anyone else was in the apartment with her. Based on these two responses, it was not an obvious mistake for the district court to find that Verdeja-Sanchez understood the questions posed to her, and that she knew she was lying in her response to the latter inquiry.

In short, the agents lawfully entered the common areas of 5352 W. Deming Place, and lawfully proceeded to knock at Lira-Esquivel's door, which was opened by his wife, Verdeja-Sanchez. While the door was partially open, and immediately after Verdeja-Sanchez had told the agents that no one else was in the apartment, the agents saw the arm of another person on a couch inside the apartment. Whether the agents believed that Verdeja-Sanchez lied because she was being held against her will by the person on the couch or because she was harboring the fugitive, Sosa-Verdeja, exigent circumstances to enter the apartment existed. Because exigent circumstances

existed, the agents had probable cause to enter Lira-Esquivel's home. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005) ("A warrantless search is permissible under the Fourth Amendment when police have a reasonable belief that exigent circumstances require immediate action and there is no time to secure a warrant."); *United States v. Jenkins*, 329 F.3d 579, 581 (7th Cir. 2003) (Exigent circumstances exist "when the police reasonably fear for the safety of someone inside the premises.") (internal quotations omitted). Therefore, all evidence against Lira-Esquivel was lawfully obtained and the Motion to Suppress was properly denied.

**2.  The Government's Surveillance of the Cell Phone (and the Effect of Sosa-Verdeja's Arrest Warrant Thereon)**

Lira-Esquivel asserts that the district court erred in concluding that he lacked standing to challenge the government's use of the cell site information to track Sosa-Verdeja's cell phone in his private residence. We need not review this issue in light of our determination maintaining the legality of the entry to and search of Lira-Esquivel's apartment, and his subsequent arrest. Nor do we need to address the effect of Sosa-Verdeja's arrest warrant on the right of entry for this same reason. Again, all evidence obtained was done within the bounds of the law.

### III.  Conclusion

For the reasons stated above, the district court did not err in denying both Amaral-Estrada's and Lira-Esquivel's Motions to Suppress Evidence. The district court's orders are AFFIRMED.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*