In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1818

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEITH ABDUL JENNINGS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 06 CR 71—**Robert L. Miller, Jr.**, *Chief Judge*.

ARGUED NOVEMBER 13, 2007—DECIDED SEPTEMBER 15, 2008

Before COFFEY, EVANS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* Moments before heavily armed police began to execute a nighttime search warrant at an apartment in South Bend, Indiana, Keith Jennings drove his car into a parking spot next to the targeted apartment. This area was inside the security perimeter that police had established for the search, so two officers boxed him in with their cars and approached with guns drawn. In plain view through Jennings's window, the officers saw a

plastic bag containing what turned out to be 13 grams of crack cocaine.

Jennings was charged with possessing the crack with intent to distribute, *see* 21 U.S.C. § 841(a)(1), and he moved to suppress the drugs on the ground that he was detained without reasonable suspicion. The district court denied that motion, and a jury found him guilty. The court sentenced him to 360 months after concluding that two of his prior convictions—one for a drug-trafficking crime and the other for resisting a law enforcement officer—qualified him as a career offender. *See* U.S.S.G. § 4B1.1(a). On appeal Jennings challenges the suppression ruling and his sentence. We affirm.

## I. Background

Several South Bend police officers testified at the suppression hearing and described the events leading up to Jennings's arrest. Sergeant Tim Medich testified that on May 3, 2006, he applied for a warrant to search an apartment located at 428 South 27th Street in South Bend. In his supporting affidavit, Medich related that within the previous 48 hours an informant bought cocaine at the apartment. A state judge issued a warrant for the premises, a one-story duplex at the end of a cul-de-sac.

Lieutenant David Ryans described the area around the targeted apartment. He testified that 27th Street runs south about 200 to 300 feet from its intersection with Jefferson Street and dead-ends in the cul-de-sac, which serves as a parking area because the surrounding apart-

ments have no driveways or off-street parking. The apartment to be searched has ground-level entrances in the front and back, and the front door is on the north side, closest to the cul-de-sac.

Lieutenant David Ryans testified that before the search officers had set up a security perimeter around the targeted apartment to secure the front, rear, and sides of the building. The purpose of a security perimeter is to protect the safety of the officers and innocent bystanders while a warrant is being executed. Ryans testified that the scope of a security perimeter at a search scene varies, but he said that it typically covers the outer 25- to 50-foot radius of the building to be searched.

Officer Charles Flanagan testified that on the night of the search, he was assigned to "eyeball" the 27th Street apartment while a SWAT team was briefed at the station. The SWAT team planned to enter the apartment through the back door. Because they would be armed with high-powered rifles that could penetrate walls or windows, it was Flanagan's responsibility to inform them if there were any bystanders around the front of the building before the search began. Around 8:30 or 8:45 p.m., Flanagan went to 27th Street in an unmarked car and positioned himself on the street just short of the cul-de-sac where he could watch the front of the apartment. Although there were quite a few cars parked in the cul-de-sac, there was no traffic on 27th Street. At about 9:30 p.m., just before the search began, Sergeant John Mortakis arrived with several other officers in an unmarked van. Mortakis parked his van directly behind Flanagan's car.

Officer Flanagan and Sergeant Mortakis described what happened next. About 30 seconds before the search began, the SWAT-team commander radioed Flanagan, who confirmed that all was clear. To Flanagan's surprise, just after he gave the all clear, Jennings drove up from Jefferson Street in a white Cadillac, passed Mortakis's van and Flanagan's car, and parked within the security perimeter, about 35 to 50 feet away from the targeted apartment. Another car was parked in the space closest to the apartment, but Jennings parked the Cadillac in the next-closest space. Mortakis immediately pulled his van directly behind the Cadillac, blocking it from leaving. Flanagan saw the Cadillac's reverse lights come on, so he drove his car between Mortakis's van and the Cadillac, right against the Cadillac's bumper, to make sure it could not leave.

Several officers then approached the Cadillac with their guns drawn, yelling for its occupants to show their hands. The passenger complied immediately, but the officers saw Jennings making furtive movements with his hands. As they approached with flashlights, the officers saw Jennings put a plastic bag containing crack under the center armrest before putting his hands in the air. Sergeant Mortakis explained at the suppression hearing that he blocked the Cadillac because it had entered the security perimeter surrounding the scene of the search. Other officers confirmed that it was police policy to stop anyone who enters the security perimeter during an ongoing narcotics search because the execution of a drug-related search warrant creates special dangers for the public and for the officers conducting the search.

The district court denied Jennings's motion to suppress. The court concluded that even in the absence of reasonable suspicion, the police "may detain—briefly, and with no more than reasonable force—those whose presence adjacent to the scene of a search poses a potential significant risk to the officers." The court held that the safety risks posed by Jennings's breach of the security perimeter justified a brief stop.

## II.  Analysis

### A.  The Suppression Ruling

In challenging the district court's suppression ruling, Jennings first argues that the search warrant did not authorize the officers to search him or his car. But the government has never argued that it did; instead, the government has always contended that the officers were justified in detaining Jennings to ensure his and their safety during the search, and that once he was detained, the police saw the bag of crack in plain view. Jennings also argues that the detention violated the Fourth Amendment because the officers had no reason to suspect that he or his passenger were involved in criminal activity. We review findings of fact on a motion to suppress for clear error; a determination that a seizure was reasonable is reviewed de novo. *See United States v. Sandoval-Vasquez*, 435 F.3d 739, 742 (7th Cir. 2006).

The Fourth Amendment requires searches and seizures to be reasonable, *Illinois v. McArthur*, 531 U.S. 326, 330 (2001), and the Supreme Court has held that this require-

ment authorizes officers executing a search warrant to "take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles County, Cal. v. Rettele*, 127 S. Ct. 1989, 1992-93 (2007); *see also Michigan v. Summers*, 452 U.S. 692, 702-03 (1981). Accordingly, officers executing a search warrant have categorical authority to detain any occupant of the subject premises during the search. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Summers*, 452 U.S. at 705. This authority exists in part because the probable cause underlying a warrant to search a premises gives police reason to suspect that its occupants are involved in criminal activity, and also because the officers have a legitimate interest in minimizing the risk of violence that may erupt when an occupant realizes that a search is underway. *See Summers*, 452 U.S. at 702-03.

Other circuits have held that the rule of *Summers* also permits police to detain people who approach a premises where a search is in progress. For example, in *United States v. Bohannon*, the Sixth Circuit upheld as reasonable the detention of a man who drove into the driveway of a suspected methamphetamine lab while a search was underway. 225 F.3d 615, 616 (6th Cir. 2000). The man got out of his car and walked toward the residence, and the court held that detaining him was reasonably necessary to protect the officers conducting the search, and that the man's arrival at a residence that housed a drug lab made it reasonable for the officers to suspect that he too was involved in criminal activity. *Id.* at 617. Similarly, in *Baker v. Monroe Township*, the Third Circuit held that it was reasonable for officers to detain dinner guests

who knocked on the door of a house where the police were conducting a search. 50 F.3d 1186, 1188-89 (3d Cir. 1995). Because the officers knew that drug customers regularly came and went from the house, the court concluded that it was reasonable for the police to stop and ascertain the identity of anyone approaching it during the search. *Id.* at 1191-92.

It is a logical extension of the rule of *Summers* and the reasoning in *Bohannon* and *Baker* to hold here that it was reasonable for the officers to briefly detain Jennings after he entered the security perimeter surrounding the apartment where the narcotics search was underway. Although Jennings never stepped onto the property being searched, he entered the officers' security perimeter just as a SWAT team armed with high-powered rifles entered the apartment from the rear. His arrival took the officers by surprise, and given the elevated risk of violence during a search for narcotics, they were reasonably concerned for their own and for Jennings's safety, as well as for any activity that might compromise the search. Had it become necessary for the officers to apprehend anyone trying to escape through the front door of the apartment, Jennings and his passenger would have been in their path. Under these circumstances, it was reasonable for the officers to "exercise unquestioned command of the situation" by detaining Jennings long enough to ensure that he was unarmed and uninvolved in criminal activity. *Summers*, 452 U.S. at 702-03.

The Fourth Amendment's reasonableness requirement strikes a balance between an individual's interest in being

left alone and the public's interest in community safety, crime control, and the safety of law enforcement officers engaged in the work of protecting the public and investigating crime. *See McArthur*, 531 U.S. at 331; *United States v. Burton*, 441 F.3d 509, 511-12 (7th Cir. 2006). Here, the officers' interest in maintaining control inside their security perimeter until the SWAT team secured the targeted apartment for the search far outweighed Jennings's interest in being left alone for the few moments that he was detained. Seconds passed between the moment the officers blocked in the Cadillac and the moment they saw the bag of crack in plain view through Jennings's window, giving them probable cause for arrest. In light of the limited nature of the intrusion and the officers' compelling need to maintain control within the security perimeter, Jennings's detention was reasonable. *See McArthur*, 531 U.S. at 332; *Burton*, 441 F.3d at 511-12. Accordingly, the district court properly denied Jennings's motion to suppress the crack.

## B. Jennings's Sentence

Jennings argues that the district court erred when it concluded that his Indiana conviction for resisting a law enforcement officer—a Class D felony—is a crime of violence qualifying him to be sentenced as a career offender. A "crime of violence" for purposes of the Sentencing Guidelines' recidivist enhancement includes an offense that has "as an element the use, attempted use, or threatened use of physical force against the person of another" or "otherwise involves conduct that presents a

serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a). Jennings argues that because the Indiana statute under which he was convicted requires proof of "a substantial risk of bodily injury to another person," *see* IND. CODE § 35-44-3-3, instead of a "serious potential risk of physical injury," *see* U.S.S.G. § 4B1.2(a), his conviction for resisting a law enforcement officer does not constitute a crime of violence.

We review de novo the district court's determination that Jennings's conviction was a crime of violence. *See United States v. Otero*, 495 F.3d 393, 400 (7th Cir. 2007). Whether Jennings qualifies as a career offender hinges on whether the Indiana statute criminalizing the offense of resisting a law enforcement officer categorically describes a crime of violence. *Begay v. United States*, 128 S. Ct. 1581, 1584 (2008); *James v. United States*, 127 S. Ct. 1586, 1593-94 (2007); *United States v. Lewis*, 405 F.3d 511, 514-15 (7th Cir. 2005). At the time of Jennings's offense, the statute provided that a person commits a Class A misdemeanor if he:

> (1) Forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of his duties as an officer;
>
> (2) Forcibly resists, obstructs, or interferes with the authorized service or execution of a civil or criminal process or order of a court; or
>
> (3) Flees from a law enforcement officer after the officer has, by visible or audible means, identified himself and ordered the person to stop . . . .

IND. CODE § 35-44-3-3(a) (1995). Jennings was convicted of the felony version of this resisting offense, however, which has this additional element: "the person draws or uses a deadly weapon, inflicts bodily injury on another person, or operates a vehicle in a manner that creates a substantial risk of bodily injury to another person." *Id.* § 35-44-3-3(b). The charging document shows that Jennings was prosecuted under paragraph (3) of the base offense: it says that in fleeing from a police officer, he "did speed, ignore traffic control devices, and thus did endanger drivers." That, plus the additional felony element that he operated the vehicle "in a manner that creates a substantial risk of bodily injury to another person" makes Jennings's offense a categorical crime of violence. Jennings's semantic quibble that an offense that creates a *substantial* risk of injury does not equate to one that creates a *serious* risk of injury is just that—a semantic quibble.

The Supreme Court held last term in *Begay* that the Armed Career Criminal Act's requirement that qualifying predicate felonies be offenses "that present[ ] a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), contemplates only those offenses that are similar to those itemized in the statute, that is, "burglary, arson, . . . extortion, . . . use of explosives." 128 S. Ct. at 1586. The Court noted that these itemized offenses involved "purposeful, violent, and aggressive conduct" and held that the statute's "otherwise" clause—bringing within its ambit those offenses that "otherwise involve[ ] conduct that presents a serious risk of physical injury to another," 18 U.S.C. 924(e)(2)(B)(ii)—must be interpreted to require conduct of a similar nature. *Id.* We have recently

held that *Begay*'s interpretation of § 924(e) applies to the career-offender guideline, § 4B1.1, which contains identical language. *United States v. Templeton*, No. 07-2949, 2008 WL 4140616, at *2 (7th Cir. Sept. 9, 2008).

Jennings's felony resisting-an-officer conviction required conduct that created a "substantial risk of bodily injury to another person" by an act of vehicular fleeing from a police officer by "speed[ing], ignor[ing] traffic control devices, and thus . . . endanger[ing] other drivers." This version of the resisting-an-officer offense under Indiana law thus involves the sort of purposeful and aggressive conduct that the Court's decision in *Begay* requires. The district court properly applied the career offender guideline. *See United States v. Spells*, No. 07-1185, 2008 WL 3177284, at *8 (7th Cir. Aug. 8, 2008) (affirming district court's determination that defendant's conviction for an alternative version of the felony fleeing/resisting offense under Indiana law qualified as a violent felony under the Armed Career Criminal Act).

AFFIRMED.