In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1173

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDDIE LAMAR CARLISLE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:08-CR-22—**William C. Lee,** *Judge.*

ARGUED JUNE 1, 2010—DECIDED AUGUST 11, 2010

Before BAUER, FLAUM and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* On February 18, 2008, Eddie Lamar Carlisle was arrested at the home of Michael Chapman during a drug sweep. Two officers caught Carlisle fleeing from the back of the house while two other officers entered the front door of the house. Carlisle was carrying a closed backpack with him. The officers searched the backpack and found marijuana, crack, a scale, a spatula, and packaging materials. Carlisle was

charged with one count of knowingly possessing with intent to distribute five grams or more but less than fifty grams of a mixture containing a detectible amount of cocaine base and one count of possessing with intent to distribute marijuana. Carlisle moved to suppress the evidence found in the bag, arguing that the search violated his Fourth Amendment rights. The district court held a suppression hearing. At the hearing, Carlisle claimed that the backpack was not his and that someone in the house asked him to carry the bag to the garage. The district court denied the motion to suppress on the ground that Carlisle did not have standing to raise a Fourth Amendment challenge to the search of the bag because he did not have a privacy interest in the bag. Carlisle pleaded guilty but reserved his right to appeal the district court's denial of his motion to suppress. Because we agree with the district court that Carlisle did not have a reasonable expectation of privacy in the bag, we affirm.

## I. Background

The series of events that led up to the arrest of defendant-appellant Eddie Lamar Carlisle began in the middle of the afternoon of February 18, 2008, when Sergeant Thomas Strausborger of the Fort Wayne Police Department executed a search warrant several doors down from Michael Chapman's residence. While there, Strausborger observed people coming and going from Chapman's residence in a manner that he considered indicative of a drug operation. Considering the suspicious

traffic pattern and several tips his office had previously received, Strausborger contacted Detective Andrew Irick, who worked with the agency that monitors home detention detainees, and told Irick about his suspicions.

That evening, Officers Michael Smothermon, Matthew Snyder, Andrew Irick, and Jeff Halsey went to Chapman's house to perform an unannounced visit to search for drugs. Chapman was a home detention detainee who voluntarily submitted to wearing a tracking device on his ankle and consented to announced and unannounced searches of his home as part of the home detention program. Because of Chapman's status as a home detainee, the officers did not need a search warrant. At the house, Smothermon and Snyder went to the back while Irick and Halsey remained in the front. Although all of the officers were in radio contact, the record does not precisely reflect how the timeline of what occurred in front of the house lines up with the timeline of events behind the house. Upon arriving, Irick knocked on the front door and identified himself as a police officer. Irick saw a woman peek out and begin to play with the lock. Officer Halsey looked through a side window and saw a man, a woman, and a younger child moving around the living room. Irick and Halsey heard glass breaking inside the house and then the woman opened the front door.

At some point between when the officers in front first knocked and when the officers gained access to the house through the front door, Carlisle exited through the back door of the house. Prior to Carlisle exiting the

house, Officer Smothermon saw someone look out of the vertical blinds on the side of the house. Then, according to Officer Smothermon, Carlisle exited the rear of the house in a nervous manner, paused for a second glancing around, and began to run toward the alleyway behind the garage. Carlisle was carrying a backpack with him. When Carlisle started to run, Officer Smothermon came out of his hiding position and ordered Carlisle to stop. Officers Smothermon and Snyder did not know who Carlisle was and thought he may be Chapman trying to escape. Smothermon drew his taser and ordered Carlisle to the ground. Snyder drew his gun. Carlisle put the bag down and laid down on the ground. Smothermon handcuffed Carlisle. The officers said that they handcuffed Carlisle because he was attempting to flee and because they feared for officer safety due to the nature of the search of the house. Around the same time that the officers in front gained access to the house, one of the two officers in the back of the house radioed the front door officers to tell them that they apprehended an individual attempting to flee.

Inside the house, the officers conducted a consent search. The officers secured the adults in the dining room area and performed a protective sweep of the home. Because it was cold outside, the officers took Carlisle inside. The officers also grabbed the backpack and brought it into the house. Inside the home, Officer Snyder asked Carlisle for identification while Officer Smothermon patted him down to determine whether he had any weapons, which he did not. Officer Snyder also searched the bag that Carlisle had been carrying.

Officer Snyder testified that he could not determine the contents of the bag without opening it. There is no testimony that Officer Snyder attempted to do a pat-down of the bag to determine if it contained weapons without opening it. When Officer Snyder opened the backpack he saw a clear plastic bag containing a green leafy substance and an off-white substance in the shape of a cookie, which turned out to be crack. Based on his experience, Officer Snyder recognized the green leafy substance as marijuana. He did not recognize the off-white substance. Officer Snyder also saw a scale with a powder residue on it, a spatula, and packaging materials in the bag. At that time, Officer Snyder read Carlisle his *Miranda* rights. According to Officer Snyder, Carlisle denied knowledge of the contents of the bag. Carlisle did not claim or deny ownership of the bag at that time.

Carlisle moved to suppress the evidence found in the bag. At the suppression hearing, Carlisle gave the following testimony concerning his relationship to the bag:

> Q: You were taking the bag to the garage?
>
> A: Yes, sir.
>
> Q: Going to throw it away?
>
> A: No. Just asked me to put it there.
>
> Q: They asked you to put it in there?
>
> A: He, he asked me.
>
> Q: Who asked you?
>
> A: Michael Chapman.

Q: Because it wasn't your bag, right?

A: No.

Q: It was Chapman's bag?

A: Yes, sir.

Q: You didn't know what was it in?

A: No.

The district court denied the motion to suppress the evidence. First, the district court found that the initial stop was a proper *Terry* stop based on reasonable suspicion arising from Carlisle's exiting the rear of a house that was being searched in connection with suspected drug activity. Turning to the search of the backpack, the district court found that Carlisle did not have standing to raise a Fourth Amendment claim regarding the search because he did not have a reasonable expectation of privacy in the bag. In the alternative, the district court found that even if Carlisle did have standing, the search was proper under the Fourth Amendment.

## II. Discussion

Carlisle appeals the district court's findings that the initial stop was reasonable and that the warrantless search of the backpack did not violate his Fourth Amendment rights. When reviewing a district court's denial of a motion to suppress, we review factual determinations for clear error and legal questions de novo. *United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2007). Determinations of probable cause and reasonable suspicion are normally

mixed questions of fact and law, but when "what happened?" is not at issue, the ultimate resolution of whether probable cause or reasonable suspicion existed is a question of law which we review de novo. *United States v. Burnside*, 588 F.3d 511, 516 (7th Cir. 2009).

## A.  The Initial Stop

Carlisle contends that the officers did not have sufficient reasonable suspicion to stop and detain him and therefore, this stop violated his Fourth Amendment rights. If the stop was improper, the fruits of the stop would also be improper and the contents of the bag should have been excluded.

Police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The suspicious conduct may be ambiguous and susceptible to an innocent explanation, but the officers may detain the individual to resolve such ambiguity. *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000). Officers may rely on their experience in evaluating the significance of the suspect's conduct. *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). During the stop, the officer may conduct a pat-down search to determine whether the person is carrying a weapon if the officer has an articulable suspicion that the subject is armed and dangerous. *Terry*, 392 U.S. at 24. The protective search permitted without

a warrant during a *Terry* stop is "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). The officers may also detain a bag or luggage from a suspect when they have reasonable suspicion to believe that the bag contains contraband or evidence of a crime. *United States v. Place*, 462 U.S. 696, 708-09 (1983); *United States v. Ward*, 144 F.3d 1024, 1030-31 (1998).

We find that the officers had reasonable suspicion to believe that criminal activity was occurring and that Carlisle was armed and dangerous, thereby making the initial stop proper. Officer Smothermon testified at the suppression hearing that he stopped Carlisle because:

> We, um, were there to, um, search the home based on the tip information that there may be narcotics that could be going on, and they would be looking out the blinds and, and, um, this, um, individual suddenly bursting out the rear of the home attempting to flee, I felt it prudent to stop and see what he might be doing. That seemed suspicious to me.

In response to a follow-up question regarding why he feared for officer safety, Smothermon stated, "I had a heightened sense of awareness based on the peeking out of the blinds. The reason that we were there to start with, and that he, he did it in an urgent manner, try to flee the residence." When asked why the officers handcuffed Carlisle once he had stopped, Officer Snyder responded:

> We were there to do a narcotics investigation due to tips we have received from the Fort Wayne City vice narcotics, and, um, basically when you are in a situation like that with narcotics, um, usually weapons are involved more often than not, so we handcuffed for officer safety and escort them back inside.

Both officers testified that they did not attempt to identify Carlisle until they were back inside the house.

The government relies on the following factors to justify the propriety of the stop: (1) the nature of the officers' visit to the house; (2) the person peeking out from the blinds prior to Carlisle exiting the house; (3) Carlisle's attempt to leave the house while a drug search was occurring; and (4) the nervous manner that Carlisle left the house, described by Officer Smothermon as "target glancing" and then running. These factors are all relevant to our consideration. We have previously held that the detention of an individual attempting to enter an area that was currently secured for the purpose of a narcotics sweep was proper. *United States v. Jennings*, 544 F.3d 815, 818-19 (7th Cir. 2008). In *Jennings*, we reasoned, "it was reasonable for the officers to 'exercise unquestioned command of the situation' by detaining Jennings long enough to ensure that he was unarmed and uninvolved in criminal activity." *Id.* Additionally, the Supreme Court has held that evasive behavior and flight are suggestive of wrongdoing and can be factors considered in a court's determination of whether an officer had reasonable suspicion to execute a *Terry* stop. *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2006). These

cases, read together, make it unquestionable that an individual fleeing an area where a narcotics sweep is taking place gives rise to reasonable suspicion to justify a *Terry* stop.

Carlisle does not rest his argument solely on the contention that the initial stop was improper, but rather argues that the officers' continuation of the stop was improper once Carlisle complied with the officers' order to get down on the ground. To support this argument, Carlisle interprets the officers' testimony to mean that the only purpose of the stop was to insure that he was not Chapman attempting to escape. As such, he claims that the officers should have asked for name and identification and let him go upon learning that he was not Chapman. The government casts the reasonable suspicion in broader terms. The government suggests that the officers had a reasonable suspicion that someone in the home wanted to hide contraband and that anyone leaving should at least be stopped and asked about what was happening. The government's formulation of the reasonable suspicion is consistent with the totality of the evidence—someone glancing out the window blinds, Carlisle exiting from the rear of the house while officers were knocking at the front, Carlisle carrying the backpack, Carlisle looking from side to side once outside the door, and Carlisle running towards the only possible exit from the rear. Under these circumstances, it was reasonable for the officers to stop Carlisle and detain him to ask questions to determine why he was leaving the house with a backpack during a drug sweep. While handcuffing is not a normal part of a *Terry* stop, it does not

automatically turn a *Terry* stop into an unlawful arrest. *United States v. Smith*, 3 F.3d 1088 (7th Cir. 1993). Given the totality of the circumstances, the officers' actions in detaining Carlisle did not violate his Fourth Amendment rights.

### B. The Search of the Bag

Carlisle next challenges the search of the bag. After securing Carlisle and bringing him and the bag into the home, Officer Snyder opened the backpack and searched it. Carlisle challenges this as a warrantless search and argues that the evidence inside the bag should have been suppressed. The district court rejected this claim because it found that Carlisle did not have a reasonable expectation of privacy in the contents of the bag. We agree.

The Supreme Court has consistently held that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Under *Rakas*, the Court held that the "standing" issue under the Fourth Amendment should be addressed through the substantive Fourth Amendment question of whether the person challenging the search "had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his 'interest' in those premises might not have been a recognized property interest at common law." 439 U.S. at 143. When considering whether an individual has a legitimate expecta-

tion of privacy, a court must consider: (1) whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy; and (2) whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735 (1979) (citing *Katz v. United States*, 389 U.S. 347 (1967)). In this case, it is the first prong, the subjective expectation of privacy, that is at issue. Whether an individual has exhibited a subjective expectation of privacy is a highly fact-specific inquiry. Several key cases shed light on where courts have drawn the line for when an individual has a reasonable expectation of privacy, and can therefore challenge the search, and when he does not.

Before we examine the case law in this area, it is important to separate cases of abandonment from cases where it is ambiguous at the time of the search whether the individual had a subjective expectation of privacy in the searched area. Both the government and Carlisle cite several cases where the defendant abandoned the property at the time of the search. *See United States v. Rush*, 890 F.2d 45 (7th Cir. 1989); *United States v. Smith*, 3 F.3d 1088 (7th Cir. 1993); *Bond v. United States*, 77 F.3d 1009 (7th Cir. 1996). In these three cases cited by the parties, the defendants openly denied ownership of the property at the time of the search. In all three cases we found that the defendant's disavowal of ownership was sufficient to constitute abandonment. "Abandoned property is not subject to Fourth Amendment protection." *United States v. Pitts*, 322 F.3d 449 (7th Cir. 2003) (citing *Abel v. United States*, 362 U.S. 217 (1960)). However, this

case is not as clear cut as an abandonment case. Officer Snyder testified that Carlisle did not claim nor deny ownership of the bag at the time of the search. Therefore, the abandonment line of cases are inapplicable and we must answer a more nuanced question: under what circumstances does a defendant have a subjective privacy interest in a piece of property when ownership is ambiguous at the time of the search?

Two years after *Rakas* instructed courts to focus on whether the defendant had a legitimate privacy interest in the searched property to resolve questions of standing under the Fourth Amendment, the Supreme Court issued two opinions on the same day clarifying the issue. In *Rawlings v. Kentucky*, 448 U.S. 98 (1980), the Supreme Court held that the defendant did not have a legitimate expectation of privacy in his girlfriend's purse such that he could challenge a search of the purse that led to the discovery of illegal drugs belonging to him. At the time of the search, Rawlings was sitting next to his girlfriend on the couch with the purse between them. *Rawlings*, 448 U.S. at 100-01. Rawlings's girlfriend had her hand on the purse. *Id.* One officer ordered Rawlings to stand. *Id.* The other officer ordered Rawlings's girlfriend to empty the contents of her purse, which led to the discovery of the drugs. *Id.* At the suppression hearing, Rawlings answered "no" to the questions: "Did you feel that Vannessa [sic] Cox's purse would be free from the intrusion of the officers as you sat there? When you put the pills in her purse, did you feel that they would be free from governmental intrusion?" *Id.* at 104. In finding that Rawlings did not meet his burden of proving that

he had a legitimate privacy interest in the purse, the Court reasoned,

> At the time petitioner dumped thousands of dollars worth of drugs into Cox's purse, he had known her for only a few days. According to Cox's uncontested testimony, petitioner had never sought or received access to her purse prior to that sudden bailment. Nor did petitioner have any right to exclude other persons from Cox's purse. In fact, Cox testified that Bob Stallions, a longtime acquaintance and frequent companion of Cox's, had free access to her purse on the very morning of the arrest and had rummaged through its contents in search of a hairbrush.

*Id.* at 105 (internal citations omitted). In *United States v. Salvucci*, 448 U.S. 83 (1980), the Supreme Court held that the defendants did not have an automatic legitimate expectation of privacy in the home of defendant-Zackular's mother. The Supreme Court did not reach any determination based on the facts of search, but rather remanded for a new suppression hearing because "the respondents relied on automatic standing and did not attempt to establish that they had a legitimate expectation of privacy in the areas of Zackular's mother's home where the goods were seized." *Id.* at 95. What *Salvucci* adds to our analysis is a clear statement from the Supreme Court that the individual seeking suppression of the evidence bears a burden to prove that he had a legitimate expectation of privacy in the searched property.

Several years later, in *United States v. Peters*, 791 F.2d 1270 (7th Cir. 1986) (overruled on other grounds), our circuit

had occasion to address the issue of when a defendant has a subjective privacy interest in a piece of property. The defendant, Peters, contested the admission of evidence that came from the search of his co-conspirator's car. Peters occasionally used the car, had keys to the car, stored the car in his parents' driveway, and paid for repairs to the car. In *Peters*, we identified the following factors as key to determining whether an individual has a legitimate privacy interest in a given piece of property:

> (1) whether the defendant had a possessory [or owner-ship] interest in the thing seized or the place searched, (2) whether he had the right to exclude others from that place, (3) whether he exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether he took normal precautions to maintain his privacy, and (5) whether he was legitimately on the premises.

791 F.2d at 1281. Based on those factors, we found that Peters did not have a legitimate expectation of privacy in the car because: (1) Peters was not in possession of the car at the time of the search nor did he assert legal ownership of the car; (2) Peters's testimony at the suppression hearing did not indicate that he had the right to exclude others from using the car (he could only use the car with the owner's permission, and two or three other people regularly used the car); (3) none of Peters's statements suggested that he believed he could leave anything in the car and have it remain untouched; (4) nothing in the record indicated that Peters took any precautions to assure privacy in the car; and

(5) Peters was not in or near the car when the search occurred.

Recently, we addressed this issue again in *United States v. Amaral-Estrada*, 509 F.3d 820 (7th Cir. 2007). In *Amaral-Estrada*, the officers saw the defendant and another male driving the car at issue. 509 F.3d at 822. The defendant and passenger parked the car and walked away from it. *Id.* at 823. Several blocks away, one of the officers stopped the defendant and the passenger. *Id.* According to the officer's testimony, the defendant denied any knowledge of the car, ownership of the car, or ever having driven the car. *Id.* Amaral-Estrada testified that he never denied driving the car, he only denied owning the car. *Id.* He testified that Sosa-Verderja, the owner of the car, lent him the car about a week prior. *Id.* Amaral-Estrada also testified that Sosa-Verderja told him to drive to a specific Walgreens and go inside, and that while he was inside the store, someone would come and put something in the backseat of the car. *Id.* Amaral-Estrada did as he was told and when he came out of the Walgreens there was a black duffle bag in the back. *Id.* The officer took Amaral-Estrada back to the car. *Id.* The duffle bag was still in the back. *Id.* Amaral-Estrada still denied a connection with the car or the duffle bag. *Id.* The officer used the keys obtained from Amaral-Estrada to open the car and search the bag. *Id.* at 824. The bag contained about $254,947.00. *Id.* We found that Amaral-Estrada failed to manifest any actual or subjective expectation of privacy in the car because, based on his own testimony, he expected others to enter the car to leave or remove items. *Id.* at 827-28. Although we

did not decide this case on abandonment grounds, we also relied on the fact that Amaral-Estrada told the officers he did not know anything about the car.

None of the cases cited by the parties are factually identical to the case at hand, but when read together, they provide sufficient guidance to consider Carlisle's claim within the *Peters*'s framework. As noted above, *Peters* points the Court's attention to five key factors: (1) whether the defendant had a possessory [or owner-ship] interest in the thing seized or the place searched; (2) the right to exclude others from that place; (3) exhibited a subjective expectation that it would remain free from governmental invasion; (4) took normal precautions to maintain his privacy; and (5) was legitimately on the premises. The government argues that, because Carlisle denied ownership of the bag, denied knowledge of the contents, identified the owner of the bag as someone else, and described only fleeting contact with the bag in moving it at the owner's direction, he cannot possibly meet the five factors laid out in *Peters*.

While we ultimately agree with the government's position, this case is closer to the line than it appears at first glance. Although Carlisle disclaimed ownership of the bag, there is no dispute that Carlisle was legitimately in possession of the property. This distinguishes Carlisle's situation from that of Rawlings, where Cox was in possession of the purse at the time of the search, and Peters, who was not near the car at the time of the search. Carlisle also indicated that he intended to maintain privacy in the bag by holding onto it as he

left the house and by keeping it closed. The issue of exclusivity is murkier. From the testimony, it appears that at the time he was in possession of the bag, he had the right to exclude all others from the bag except Chapman. This factor distinguishes this case from *Amaral-Estrada*, where Amaral-Estrada expected others to take things from and leave things in the car while he was entrusted with it. What makes it questionable that Carlisle had exclusive control is the appellant's own testimony that he did not know what was in the bag or who was using the bag immediately prior to his taking it. This testimony strongly cuts against any claim of exclusive control and makes Carlisle's situation similar to Rawlings's situation where he lacked control over who had access to the searched property prior to the search. What pushes this case fully over the line is the complete lack of testimony that Carlisle had any subjective expectation that the bag would remain free from governmental invasion. Carlisle bears the burden of proving that he had a subjective privacy interest in the bag sufficient to challenge the search. *See Salvucci*, 448 U.S. 83. The record lacks any evidence of this subjective expectation and Carlisle's testimony cuts against a finding of any subjective expectation of privacy in the bag since he disclaimed ownership or even knowledge of its contents. Therefore, we find that Carlisle did not have a reasonable expectation of privacy in the backpack sufficient to allow him to challenge the search. Because Carlisle cannot validly assert a Fourth Amendment challenge to the search of the backpack, we do not reach the merits of whether the search was proper.

### III. Conclusion

For the reasons set forth above, we AFFIRM the district court's denial of the motion to suppress.